# Exhibit A

Plaintiff's Exhibit A

ALB:    Okay and then did you read what is called the statement of information required by section 341 meeting and in other words did you meet with your counsel and did he explain to you or provide to you a sheet where you have different alternatives with regard to the different filings?

??:    We did that early on _____

LL:    Yes.

ALB:    Okay

??:    _____ distinction between _____

ALB:    If not I can give you the sheet but so you did that you know about the alternatives of chapter 13 and all the others okay.  Can you describe briefly _____ specific but briefly what caused you to file for bankruptcy.

LL:    Well my liabilities outstripped my assets.

ALB:    Mmm-hmm.

LL:    As a as a result of the divorce.  Its you know it's pretty just pretty simple.

ALB:    Are you saying as a result of the divorce so prior to the divorce how were your financials at that time.

LL:    They were

ALB:    _____

LL:    They were they were okay I had a couple of very bad business dealings.

ALB:    Mmm-hmm.

LL:    Going on and so I guess I would say not great.

ALB:    But you were you had a place to live

LL:    Yes.

ALB:    You weren't okay.

LL:    No.

ALB:    And what changed after the divorce?

LL:    What changed after the divorce is I didn't have any assets.

ALB:    No assets left _____.  Did they did you have counsel?

2

LL:     I did not

ALB:    _____ the divorce

LL:     I did not.

ALB:    Why did you not have counsel.  By the way these are again not accusatory questions in nature I'm trying to just get factual information so I'm not being critical or judgmental

LL:     No no I I understand that

ALB:    Okay.

LL:     And you have every right to be judgmental in that particular case.  Uhm for a number of reasons I it's a combination of guilt and stupidity that I kind of just walked away from the marriage at that particular point.

ALB:    Okay and what would you value the assets at the time of the marriage the marital estate assets because again at the time when you filed for divorce it becomes a marital estate.

LL:     Right.  So the question again

ALB:    At the time like the date prior to the divorce

LL:     Okay okay.

ALB:    Agreement what do you think were the of your marital assets between both you and your wife?  I'm going to make it easy I'm going to ask you what the assets were what you think ballpark we'll go into specifics, the liabilities and then the net worth at that time so again I'm looking in generalities.

LL:     I would say if I can remember but also know there were divorce financial statements that were produced

ALB:    We're we're going to go over that but I'm just trying to you know

??:     From from you as best you can from your memory would fine.

ALB:    If if you'd rather see the specifics and just confirm those that's easier that's fine with _____

LL:     I would say about 6 million dollars.

ALB:    Six million of assets and liabilities at the time right prior to the divorce joint liabilities

LL:     A million and a half

ALB:    A million and a half so doing that addition you would have you would think four and a half million in net worth?

LL:     Yes.

ALB:    Between the both your you now let's go after the divorce what would you what were your assets worth after your were divorced shortly after you were divorced

LL:     Negligible.

ALB:    Negligible negligible meaning was your net worth net worth would have been just break even or or would you say you

LL:     Well

ALB:    owed more than you had _____

LL:     I owed more than I had correct.

ALB:    So after right after the divorce you owed more than you had

LL:     Correct

ALB:    So you would say you were basically on a valuation basis insolvent at that time

LL:     That's correct.

ALB:    So after the divorce were insolvent and the divorce was in August I believe of 2000 or was it August or October of 2000

LL:     I think it was August and it became official in December

ALB:    Okay that was the NISI period I presume.

LL:     Yes.

ALB:    And that was December of 2010 and then you decided to file in 2014 what what happened during the intervening four years?

LL:     Well I mean really nothing happened, I mean just try to be able to support myself

ALB:    Mmm.

LL:     but nothing major has happened between that time and just it got to a point where I just found found that it was necessary to have some relief.

ALB:    Okay now during the time of the divorce did you said you weren't represented by counsel correct?

LL:     Correct.

ALB:    Who did you negotiate with if at all?  Did you negotiate during the divorice?

LL:     Not really.

ALB:   Who did you talk to regarding the divorce?

LL:     I spoke to my former wife's attorney

ALB:   And who was that?

LL:     I I forget her last name, Nancy I forget her last name.  I don't know.

ALB:   Was that the firm Prince Tye & Labelle or?

LL:     Yes

ALB:   You remember that okay.  So you dealt with your did you have communications with you wife during that time regarding _____

LL:     Yes Yes

ALB:   And did you did she know she was leaving you without or with negligible ____ insolvent after the proceedings

LL:     Yes sir I think she did.

ALB:   Did the did her counsel know?

LL:     I think she did.

ALB:   Did you try to argue that you needed something to live on you needed to meet your obligations going forward

LL:     I did not.

ALB:   What what then convinced you to to you know sign the paper going forward which basically said that if you _____ the separation agreement I'll get specifically to it that you you agree that you're settling because if you went to trial the results could be worse.

LL:     Well they couldn't have been worse.  As as I said earlier I I signed a really guilty for I felt guilty in terms of you know my business ventures had failed.  There was a lot of money and you know a few other you know personal things that

ALB:   Mmm-hmm.

LL:     That fit in and it was just not good judgment on my part to just walk away without having representation

ALB:   But as I look over the title records it looks like you and your wife obviously prior to the divorce had purchased numbers of properties and then sold them and those properties _____.

LL:     Yes

ALB:    In terms of the sale.

LL:     Yes

ALB:    And I presume you I'm not going to presume did you have any input with regard to what you bought, how much you paid for it these various properties that you had prior to the divorce?

LL:     Well yes I mean up until the divorce period yes

ALB:    So you were buying how many properties would you say you bought during the marriage?  First let me ask this question.  How long was the marriage?

LL:     22 years.

ALB:    22 years and 23 years I counted from 1987 to the present date because you had the NISI period.

LL:     Right.

ALB:    The NISI period would mean about 23 years.

LL:     Yes correct.

ALB:    And during that time period about how many pieces of real estate _____ real estate would you have you purchased with you wife?

LL:     It's going to take a moment.

ALB:    Okay.

LL:     Let see.  Seven.

ALB:    Seven properties

LL:     Yes

ALB:    And whose money were used to pay the properties or the down payments for the properties?

LL:     Joint.

ALB:    Joint.

LL:     Yes

ALB:    So you put as much money as as did she

LL:     Yes.

ALB:   And in borrowing did each of you were each of you on the property for title purposes?

LL:     Yes.

ALB:   And each if you I presume submitted or signed applications for loans.

LL:     Yes.

ALB:   And what did each of the properties make money when you ended up selling them?

LL:     Yes.

ALB:   Was substantial monies made from the sales of the properties?

LL:     Some yes, some no.

??:     _____

LL:     Yes and no.

ALB:   Well how much how much would you say together from all of the properties that you the real estate that you either bought or invested in or whatever the case may be that you generated from all of those properties from your joint investments.

LL:     Profits

ALB:   Profits.

LL:     Maybe 8 million.

ALB:   8 million in in profit meaning that as I would see it then your contribution in buying half of these properties with her she made together with your she made 4 million and you made 4 million but she would have benefited as well by making the 4 million and if you never gave her anything in connection with the divorce then then she profited to the tune of 8 million from your initial 50% investment in each of these properties.

LL:     Yes.

ALB:   So she derived arguably an 8 million benefit from what you had invested with her. Thank you.  I'm going to go over the schedules and the only reason why what I want you to do is just to confirm if these _____ have changed in any way with regard to the value like the watch.  Is that the watch you're talking about?

LL:     Yes.

ALB:   Okay and how did you value the watch at 2000?

ALB:   Have you had money with Boston Private Bank Trust Bank and Trust Company for a while or

LL:   I've used I've used Boston Private Bank for many many years as my operating account.

ALB:   And how much how much was in Boston Private Bank to your recollection of about the divorce?

LL:   A few hundred dollars maybe. _____

??:   _____ refresh _____

LL:   Under a thousand

ALB:   In both your names

LL:   In both our names correct.

ALB:   That's it's okay alright why don't you try to summarize to the best you can the Boston baseball and and what happened with that and that how you acquired it, who you acquired it with and and how you ended up having that and what basically happened to it.

LL:   Well I'm not exactly the dates but I'm just saying saying 2008 three gentlemen plus myself, Dan Duquette, Jerry O'Connor and Terry Alford.

ALB:   Mmm-hmm.

LL:   Purchased Nashua Baseball the Nashua Baseball Profession, National Professional Baseball Club and as part of the contribution Dan Duquette rolled in his NEC NECBL baseball teams, a college team you know into the program and we called it the U.S. Military All Stars.

ALB:   Mmm-hmm.

LL:   And we we were in Nashua, New Hampshire for one years.  It was a failure.

ALB:   Mmm-hmm.

LL:   And we moved it here to Pittsfield and it didn't do much better _____.  Yeah.

ALB:   How much did you pay for Nashua Baseball?  I assume Boston Baseball LLC incorporates all of the

LL:   Yeah

ALB:   Entities

LL:   That's correct.  I'm going to have to think here.  It was around 600,000

ALB:  Mmm-hmm and how much cash?

LL:    About 400

ALB:  And who that was the cash part

LL:    Yeah.

ALB:  And who put the 400 in?

LL:    Mostly myself and then there was also a note from Nashua Bank for $250,000.00.

ALB:  Did the other investors put any money in?

LL:    Minimal.  The $250,000.00 was a loan that we all took.  It was joint and several.

ALB:  Okay individually for all?

LL:    Yes.

ALB:  Joint and several with Dan Duquette.

LL:    Yeah.

ALB:  Who else?

LL:    Jerry O'Connor

ALB:  Okay.

LL:    And Terry Alford

ALB:  Who ended up paying the 250?

LL:    I did.

ALB:  Why you and not them?

LL:    Well because at the time they you know claimed they had had no money and you know couldn't do it.

ALB:  Oh.  Dan Duquette at that time

LL:    _____ surprising.  Yes.

ALB:  Did you ever seek contribution from Duquette

LL:    Yes.

ALB:  O'Connor or Alford?

LL:      Yes yes I did.

ALB:    And and what did they

LL:      They couldn't do it.

ALB:    But they they would be liable for that as well you would

LL:      Sure.  I was the last last left standing.

ALB:    Now how did you was this paid after the divorce?

LL:      It was the the settlement the settlement

ALB:    Mmm-hmm.

LL:      Was I think $700,000.00

ALB:    Mmm-hmm.

LL:      And from that settlement came debt and that was paid for that 700,000

ALB:    This was an unsecured obligation _____

LL:      _____

ALB:    And it was unsecured why did you you didn't said you had nothing and you had debts
         after why did you decide to pay that debt and not file bankruptcy then?

LL:      I I didn't.  That was I never I never saw I saw practically none of the settlement and it
         was used to pay

ALB:    What do you mean none of the settlement?

LL:      Well the settlement I'm just going from memory.

ALB:    Yeah.

LL:      It was something 6 or $700,000.00

ALB:    Mmm-hmm.

LL:      And subtracted from that was the $250,000.00

ALB:    But if you didn't have to pay it if you weren't obligated on that I mean if you if you had
         others that were obligated they couldn't pay it you are now insolvent why would you
         choose to have it paid?

LL:      Well at that particular time I wasn't I was insolvent at that particular time.  It was paid

ALB:   So you didn't pay it.

LL:    I did not pay it.

ALB:   Okay so you didn't pay it.

LL:    I did not pay it.

ALB:   Did you instruct anybody to pay it?

LL:    I did not.

ALB:   So how did it get paid?

LL:    My former wife paid it and then deducted that from

ALB:   How do you know she she paid it?

LL:    Well because she told me that

ALB:   Okay but you never told her to pay it?

LL:    No.

ALB:   _____ why would she pay it?

LL:    Well she knew that I had these debts and you know her logic was that those debts would
       come out from any settlement that I was going to be getting.

ALB:   And what did she and that was her logic?

LL:    Yes.

ALB:   That was her logic.  Okay. _____ the money to pay it and you were you relying on
       this 700,000 that you _____ separation agreement to be at least continue your life?

LL:    Yes well yes. I mean it was very clear that that was going to come out be paid from my
       part of the settlement so I guess

ALB:   But by you but what do you mean from your part if if you had other obligations at the
       time correct?

LL:    Correct.

ALB:   You had other obligations.  Let me get to one obligation that was also on that do you
       remember in your financial statement that you had $100,000.00 obligation to an attorney
       names Burton Winnock?

LL:    Yes.

ALB:    That was an obligation.  You had obligations to I believe a Peter Gordon.

LL:    Yes.

ALB:    Okay.  So in other words you're saying that out of the settlement agreement whatever it was your understanding that she was going to pay your debts?

LL:    Yes.

ALB:    So you'd end up with nothing from the settlement agreement.

LL:    Virtually nothing yes.

ALB:    And but you never authorized her to pay Nashua Baseball?

LL:    I never authorized no

ALB:    I mean not Nashua Baseball Nashua Bank

LL:    _____

ALB:    You you never authorized her

LL:    No

ALB:    to pay that.  Did Burt Winnock get paid?

LL:    He did not.

ALB:    But okay.  I didn't see Burt Winnock on the schedules.

LL:    He forgave that debt.

ALB:    He forgave the debt?

LL:    He he's been a lifelong friend of mine and _____ done 25 years of legal work for _____

ALB:    When did he forgive the debt?

LL:    I don't remember the timing exactly.

ALB:    Did you disclose that forgiveness on your tax returns?

LL:    No I did not.

ALB:    So

LL:     And this actually it really wasn't personal debt anyway I mean it was debt that was accumulated from business ventures that I had and you know I I was the only one left standing and

ALB:    It was not but right here financial statement you list Burt Winnock legal $100,000.00.

LL:     Right.

ALB:    So _____ that financials is that financial statement correct then?

LL:     Yeah it is correct

ALB:    But you said it was for business debt

LL:     Well

ALB:    For businesses

LL:     Yes it was however I saw it as my own personal obligation to my friend.

ALB:    Nashua Bank by the way I'm showing the right here for the Commonwealth of Massachusetts the financial statement filed with the divorce the financial statement of Leslie Lewis is this your financial statement that you submitted _____

LL:     Yes yes it is.

ALB:    divorce.  Okay.  For purposes of the examination I'll call this Exhibit A.

??:     Should we somehow mark that with a pen or

ALB:    _____.  So here Nashua Bank under liabilities on page 8 of 9

LL:     Yes

ALB:    It puts joint and several personal loan joint and several as to whom that's

LL:     _____

ALB:    Is your wife on that one

LL:     She was

ALB:    She was

LL:     Yes she was

ALB:    She was on that one

LL:     Yes _____

ALB:   _____ she's paying off just like as if Dan Duquette, Jerry O'Connor or Jerry Alford had _____ she's paying off an obligation that she owes

LL:   _____

ALB:   On her own.

LL:   Yes.  She she was one of the people that signed _____

ALB:   So why so you didn't authorize her to pay it.  She pays it on her own

LL:   Right.

ALB:   Do you know where she paid it from?

LL:   What do you mean?

ALB:   Where did she get the money to pay it?

LL:   Well she took it out of her own savings or

ALB:   But you don't know how she paid it?

LL:   I do not.

ALB:   Would it surprise you if I told you that that she didn't pay it?

LL:   Yes.

ALB:   Would it surprise you if I told you that it was paid by Lisa London?

LL:   Yes.

ALB:   It would surprise you?

LL:   Yes.

ALB:   Okay because if Lisa London paid it that wouldn't be your wife paying it

LL:   I don't know anything about that?

ALB:   Therefore you would be entitled to 250.  She had _____

LL:   I I did not know that it's news to me.

ALB:   Okay.  John Stabile joint and several who would that who was the several with John Stabile obligation.

LL:   The same _____ not not

15

ALB:  Was your wife

LL:    No she was not

ALB:  She wasn't but so Stabile actually has a claim against Duquette, O'Connor and Alford?

LL:    Yes

ALB:  And to your knowledge if any of those paid Stabile?

LL:    No no they have not to my knowledge.

ALB:  Okay and would you would O'Connor, Alford or Dan Duquette have any defenses to paying to the obligation to Nashua Bank or John Stabile?

LL:    Yes yes they would because at a point in time when you know things started to look like the it was going to be very difficult to pay John Stabile you know back

ALB:  Mmm-hmm.

LL:    John asked me to sign personally for it you know just myself which I did just try to you know save you know save the the business.

ALB:  Mmm-hmm.  _____ but what I mean that's not a defense they would have in other words the fact that he that they're not collectible is not a defense

LL:    Right.

ALB:  What would they have any arguments that they the sale was wrong

LL:    No.

ALB:  Bad or any _____

LL:    No.

ALB:  defense _____ way that they didn't get what they

LL:    No.

ALB:  bargained for

LL:    No

ALB:  So they did get what they bargained for

LL:    Yes

LL:     They they needed it because they had a pool and and a pool house that had to be set back just a bit.  It it was if I recall it was you know _____ it couldn't be built on anything and so so what what someone how much would someone pay for something like that do I think probably not much.  Half an acre and unbuildable and that was my guess.

ALB:   Okay but you didn't you didn't investigate the price either.

LL:     Nope.

ALB:   You didn't look at it

LL:     Didn't

ALB:   Were they friends

LL:     Friends.

ALB:   Okay and you said there was a loan Peter Gordon had loaned

LL:     Yeah another occasion in connection with the baseball

ALB:   Was this earlier before this before they transfer the land?

LL:     This was

ALB:   The transfer of the land was May of 2010 is that right?

LL:     That's correct May of 2010

ALB:   And so when did Peter loan you money?

LL:     It was probably around the same time.  I just I don't recall.

ALB:   Was it before or after the divorce?

LL:     It was before the divorce.

ALB:   Before the divorce but again I'm going back to Exhibit A which is the financial statement.  Was Peter how much money was loaned?

LL:     250,000 and my former wife paid that prior to the divorce and then it

ALB:   Paid it prior to divorce?

LL:     Correct.

ALB:   So therefore it didn't need to be listed on this

LL:     _____

ALB:    Financial so prior to the divorce okay.  Now your wife ex-wife former wife had a business at the time.

LL:     Yes.

ALB:    Okay and what was that business?

LL:     Interior design service.

ALB:    And do you know how much the or how much that business would was worth?

LL:     I don't want to be evasive but it's very hard to put a price tag on it.  It wasn't a physical business it was just sole proprietorship with no assets.

ALB:    But she was an interior designer?

LL:     Yes. She maintained an office _____

ALB:    Where was the office?

LL:     Office was in the home.

ALB:    Okay and did she derive an income from that?

LL:     Yes.

ALB:    Do you know how substantial or insubstantial?

LL:     It was substantial.

ALB:    So do you know how much a year _____?

LL:     I would say in excess of 300,000.

ALB:    Okay.

LL:     That's income _____

ALB:    _____ again but it's income.  Did you file joint returns

LL:     Yes we did.

ALB:    You you filed joint returns so it was income to the family

LL:     Right right.

ALB:    Okay.  Did she do design work for the Gordons?

LL:     Yes

ALB:   Okay.  Peter and Wendy Gordon?

LL:   Yes.

ALB:   Alright.  Do you recognize this document _____ as _____ its agreement dated October 9, 2009 Nashua Baseball Stabile American Defenders and Leslie Lewis.  Do you recognize that document?

LL:   Yes.

ALB:   And what is that document?

LL:   When we purchased the baseball team it was the difference between what we paid John Stabile.  It was it was a remaining balance.  It was this remaining balance and yeah this was the remaining balance.

ALB:   So this is as of October 9 and this requires as of letter of credit posting of the letter of credit

LL:   Yes

ALB:   But instead of the letter of credit if you look at paragraph 5 because you weren't able you not weren't able to but you didn't post a letter of credit you made a representation

LL:   Yes

ALB:   Is that correct?

LL:   Yes

ALB:   And that was that was correct at the time?

LL:   Yes

ALB:   And still correct so what is that statement say that you had

LL:   It was _____ acknowledge at the _____ bank and currently _____ at least 350,000 _____ as such amount will hold.

ALB:   Okay and the name of that bank is?

LL:   Sanford Bernstein

ALB:   And did you have an account at Sanford Bernstein?

LL:   Yes I had a joint account

ALB:   ____ you have a joint account at Sanford Bernstein and how much money was in it at the time

LL:     I _____.

ALB:    Ilyas, do you want to take it from her and then I'll, or do you want me to go through the
investor financial and separation agreement?

IR:     It it's up to you.  If you want to finish I can I can jump in.

??:     _____ you were doing your job _____.

ALB:    Okay well let's go over the the financial statement filed in connection with the divorce
which is Exhibit K okay.  So directors fees you were a director of a company at the time?

LL:     Yes

ALB:    Okay.  So that was your weekly gross income about $692.00.

LL:     Yes.

ALB:    How did you value the I'm on the assets page for the financial statements middle of the
separation agreement how did you _____ how did you first of all _____ do
you know do you remember what you paid for it?

LL:     I think we paid 2.6.  I'm not sure

ALB:    Okay.

LL:     But I think that was probably the amount.

ALB:    Okay and at the time of the separation agreement you thought it was worth about 2.6

LL:     Yeah.  Yeah.

ALB:    Okay and you said the but I mean it was assessed for 2.6

LL:     Right.

ALB:    And the value of the property

LL:     _____

ALB:    _____ 3 million

LL:     which was my guess.  I think it _____

ALB:    _____ guess

LL:     We _____ paid very close to 3 million and I I _____

ALB:    And you think it was worth at least that 3 million.  The Conehill Road property

LL:      Yes.

ALB:   And this would have been the the remaining property after you sold the parcel for 7 million and Peter Gordon's $4.00 _____

LL:      Yeah right.

ALB:   But this would have been left over.

LL:      Yeah we built a home.  We built a house on that property.

ALB:   Okay and you built who paid for the house to be built?

LL:      The house came from the proceeds.

ALB:   Of the 7 million

LL:      Yeah.

ALB:   Okay

LL:      The house and the land.

ALB:   So you contributed to that

LL:      Yes

ALB:   As well as she did and so you but the purchase price for this property on 423 Conehill was 2.3

LL:      That includes the land at a half a million

ALB:   So the land was half a million

LL:      No the land was a million and a half

ALB:   Land 1.5 and this in addition to this or this is just the total with the land

LL:      That's the total

ALB:   Okay so the house was 800 you say

LL:      Yeah

ALB:   _____ purchase okay.  Alright and the value of that property at the time of the divorce you didn't put down what do you think the fair oh you did you did right here 1.8 million

LL:      Yeah.

LL:     Yes

ALB:    You have no ability to pay these creditors after but Nanette knew that as well

LL:     Yes.

ALB:    And would you presume her attorneys knew that or

LL:     Yes

ALB:    did they definitely know that do you know if you spoke to them or not?

LL:     I did not speak to them about that.  They would have have to have known.

ALB:    Okay.  There is a provision in there regarding bankruptcy that you have to let Nanette
        know that you're intending to file bankruptcy prior to your filing bankruptcy did you let
        her know?

LL:     Yes.  Prior just prior to yes.

ALB:    Was it because of the provision in the bankruptcy

LL:     No.

ALB:    _____ separation agreement

LL:     Just felt it was time and I had to do it.

ALB:    Do you remember what her reaction was?

LL:     It wasn't no reaction.

ALB:    No _____.  Okay.

IR:     Good afternoon.  My name is Ilyas Rona just going to ask you some questions.  First of
        all you we _____ just a few moments ago that you and I reflected on in your answers
        during that break and thought there's additional things you'd like to add or that you might
        have misremembered.  I think what I'm going to do and I apologize.  I'm going to go
        back over some of the ground that we covered just to try to fill in some blanks at least
        maybe in my mind.  You were asked about the real estate that was purchased during the
        marriage with Nanette and I think you said there about 7 properties in total and you asked
        if if those were purchased using joint money.  I _____ said yes and _____ you
        asked if you signed joint loan applications.

LL:     Yes.

IR:     Were there also joint mortgages?

LL:     Yes.

IR:    And and joint debt

LL:    Yes

IR:    With respect to those properties

LL:    Yes

IR:    Could we if you don't mind trying to go chronologically identify the 7 properties and if it's state or however it's going to shake out based on on the land versus the land and house that's fine.  I just wanted to see if I can get squared away on what's these properties are.

LL:    From the time we were from the time we got married?

IR:    Yeah.

LL:    And that _____ the exact dates

IR:    That's I don't I'm not looking for dates.

??:    _____

IR:    _____ some something that will identify the property as opposed to any other property

LL:    Yeah okay fine.  The first property that we had together was on Chestnut Hill Road in Chestnut Hill.  Then 120 Cabot Street in Chestnut Hill, 120 Seaver Street in Brookline, 45 Laurel Road in Chestnut Hill and there were 2 second homes, one in Cotuit, Mass on Main Street, actually 3 and then 411 Summit Road in Richmond and then 423 Conehill Road in Richmond.

IR:    Okay and are I think answered this questions but with respect to the first 4 the properties in Chestnut Hill or in Brookline were those at all times the primary residence?

LL:    Yes.

IR:    And you both lived in them?

LL:    Yes.

IR:    And was one was were the purchases and sales sequential meaning that when you sold one you bought the next one?

LL:    Yes.

IR:    Okay.  Was there ever a period of significant overlap in the

LL:    No

IR:    And what did they explain if anything about the payment of debt?  Why it was structured this way

LL:    Well I suppose to to be sure that those debts were paid and that she would be free and clear

IR:    So your understanding was that the intent or one of the goals from he point of view was to make sure that she was not _____ financially _____ for those debts.

LL:    Correct.

IR:    Okay.  And if I could direct your attention we'll look at M and M1 and just to make sure that they're not any different but if you could look at 8 section 8A and then double (ii). So right below the handwritten portion.  It says $250,000.00 upon sale of the Berkshire home.

LL:    Yes.

IR:    Okay do you recall what what was meant by or was the purpose of having in the agreement that you would get $250,000.00 upon the sale of the Berkshire home.

LL:    That $250,000.00 was to pay a note to Peter Gordon which she paid from

??:    _____. You said that was paid prior to the divorce.  Your earlier testimony

LL:    It _____ I'm not exactly sure

??:    _____

LL:    I never saw the money.  The money was paid _____

??:    You stated it was prior to the divorce because your financial statement did not list the Peter Gordon debt therefore it was paid prior to the _____.  That's your testimony.

LL:    Yes.

??:    Do you want to change that testimony?

LL:    No.

??:    So it was paid prior to

IR:    Okay and and I'm just trying to understand what that section means so regardless of when it was paid was it your understanding that that clause 8A(ii) was to reflect the repayment of the Gordon note.

LL:    Correct.

IR:     No.  Okay and that that handwritten part says Buddy has received 46,000 of the 196 196,000 leaving 150 to be paid as judgment of divorce.  Is that do you see that?

LL:     Yes.

IR:     Okay does did does that Exhibit M say the same thing as what I just read from M1?

??:     That's the handwritten part

??:     _____

LL:     _____ so I'm sorry what _____

IR:     Is did is the handwritten part in on Exhibit M does it say that Buddy has received 46,000

LL:     Yes yes yes

IR:     Okay.  Do you is is that an accurate statement?

LL:     I received 46,000 and leaving the balance to paid at judgment at divorce which I did not receive.

IR:     Okay.  _____ one question did you receive 196?

LL:     No.

IR:     Okay so you did not receive 196,000 on top of anything?

LL:     No.

IR:     Did you did receive 46,000?

LL:     Yes.

IR:     When did you receive that?

LL:     I received that I'm not exactly sure but I think it was on or the time that we signed the separation agreement

IR:     And did you receive it in the form of a check?

LL:     Yes.

IR:     And _____ there any reason why it was 46,000 as opposed to a different sum?

LL:     No.

IR:     It was never explained to you

LL:     Yeah.

IR:     Okay and you mentioned Josh Fink

LL:     Yes

IR:     Is Josh Fink her son from a prior marriage?

LL:     Yes

IR:     Does Josh Fink live in Boston?

LL:     Yes as as far as I know.

IR:     Okay

LL:     He did when _____

IR:     Oh is does he as far as you know does he still live in Massachusetts?

LL:     I don't know.  I'm not _____ I guess so I don't know.

IR:     And the dealing that you had with him do you recall what that had to do with the $3,000.00 that you financed him

LL:     _____ it was an investment that we made _____some money investment and I I gave it to him.

IR:     Okay do you know what business line of business Josh Fink is in?

LL:     Is he in today?

IR:     Yeah.

LL:     I'm not I don't know.  I think he sold I heard that he sold his business so I don't know.

IR:     So this is a a substitute copy of Exhibit N.  _____ _____ _____.
        Have you ever seen this document before?

LL:     I don't recall this document.

IR:     Okay.  You don't recall ever seeing it signed or unsigned a document like this?

LL:     I have not.

IR:     You don't recall anyone ever presenting a document titled agreement for modification and asked you to sign?

LL:     No.

IR:     Alright.  You recall any discussions with Nanette or her attorneys about

LL:     No.

IR:     Modifying the agreement

LL:     No.  The only thing I recall that has got anything to do with it is is on this document.

IR:     Exhibit M and incidentally did did you keep copies of the divorce documents?

LL:     This is the only copy that I have a copy of this.

IR:     Okay and is Exhibit M the document you did you provide a copy to Mr. Martin?

LL:     I did and that's all I had and that's all I provided _____.

IR:     Okay and if you had a modification or any other documents related to the divorce agreement would you have provided that to Mr. Martin?

LL:     Yes.

IR:     Incidentally on the subject of Mr. Martin how long as he been your attorney?

LL:     I'd say 2 years.  Do you _____ ask _____

??:     2010

LL:     Yeah.

??:     Some _____ 2010

IR:     Okay and have have have you Mr. Martin is representing you in the bankruptcy?

LL:     Yes.

IR:     But without getting into specifics you had the you're attorney client relationship with Mr. Martin preceded the bankruptcy

LL:     Yes.

IR:     And did it have to do with some of your business dealings?

LL:     Yes.

IR:     He's he was Mr. Martin represent to you a bankruptcy attorney?

LL:     Say it again.

IR:     Did do you view him as a bankruptcy attorney?

LL:    Yes

IR:    Okay do you view him as a business attorney?

LL:    Yes.

IR:    Did you view him as a business attorney before you viewed him as a bankruptcy attorney?

LL:    Yes.

IR:    I'm just trying to find out I think you're asked some questions about when you began contemplating bankruptcy prior did you were you interacting with Mr. Martin before you began contemplating bankruptcy?

LL:    Yes.

IR:    Okay.  So looking at Exhibit N if you if you could.  Your your initials and signature do not appear on Exhibit N.  N as in Nancy which is to _____.

LL:    The question was?

IR:    Do your initials or signature appear anywhere on that document?

LL:    No.

??:    Actually I think I do think _____ the last page.

??:    _____ there's a there's a separate signature page

??:    The last page.

IR:    Oh I'm not sure I have that.  It's been stamped 0046.  Oh okay the copy that was returned to _____ by your _____ so I don't know.

??:    _____ this is the one that _____.  This was the unmarked one she brought in.

IR:    Yeah so the original my original doesn't.

??:    This this is the one that just got emailed to us.

IR:    Oh I see okay so if okay is that your signature?

LL:    It is.

IR:    You recall making that signature?

LL:    I do not.

IR:     Is there any explanation for do you have any reason to doubt that that's your signature?

LL:     No that's my signature.

IR:     Is there any reason

LL:     _____ are not my initials but this is

IR:     Do you have any reason that you can think of why you don't remember signing that

LL:     No.

IR:     document in Exhibit A

??:     What what's not your initials you said

IR:     And and I'm not suggesting that there would be _____ I just thought if his initials appear

LL:     _____ my initials

??:     Those aren't on the modification

LL:     Does not appear that they are.

??:     Okay.

IR:     Do you recognize what initials are in the lower of the two lines that's next to LL?

LL:     No I don't

IR:     Did you ever cross out any initials on

LL:     I did not.

IR:     on any documents?

LL:     _____

IR:     Okay.  Are there without and I don't mean to sound offensive but are there any reasons relating to your health or some situations you're going through that would affect your ability to remember signing a document sometime in 2010?

LL:     I did have kind of a nervous breakdown.

IR:     Okay.

LL:     During that period of time.

IR:     Okay so did you get treatment for that?  Do you recall where you were treated with or who you treated with?

LL:     Yes, Dr. Jonathan Kolb, Brookline.

IR:     How do you spell the last name?

LL:     K o l b

IR:     And is is Dr. Jon Kolb a psychiatrist?

ALB:    _____ be _____

LL:     Say again?

??:     _____

IR:     Is he a psychiatrist?

LL:     Yes.

IR:     And had you known him before 2010?

LL:     Yes.

IR:     Had you treated with him before 2010?

LL:     Yes.

IR:     Is it fair to say that your condition whatever it may have been got worse in 2010?

??:     This this was _____ what she printed _____.

??:     Yes.

??:     Okay.

IR:     Where you hospitalized at all?

LL:     Yes.

IR:     Okay where were you hospitalized?

??:     _____ separation _____

LL:     At McLean.

??:     _____ yes.

IR:     So my _____ I saw your email _____ the modification

ALB:  _____

IR:  _____ separation _____.  When it comes in I'll step out and have it printed.

??:  Okay.

??:  Yeah okay.

IR:  And again I'm not going to ask you too may ____ but how how long do you think you were hospitalized for?

LL:  2 weeks

IR:  Was the separate the divorce separation divorce one of the stressors that contributed to the hospitalization?

LL:  Yes.

ALB:  Did Nanette know that you were going through this traumatic experience?

LL:  Yes.

ALB:  She did.

IR:  Over that period

ALB:  Over that period including during the time of the negotiations _____ divorce.

LL:  Yes.

ALB:  Did you attorneys know?

LL:  I do not know.

ALB:  But Nanette _____

IR:  Did she ever come visit you?  Did she come and visit you at McLeans?

LL:  Yes

IR:  She did.  Okay were you covered under health insurance at the time?

LL:  Yes.

IR:  What was the source who provided the health insurance for you?

LL:  My own my own company

_____.  Just want to ask you a couple more questions about that.  If you look on the second page of Exhibit N there is a reference to two lawsuits.

LL:     Yes.

IR:     Do you recall those lawsuits?

LL:     Yes.

IR:     Do those lawsuits relate to the the two debts that you describe the Gordon debt and the Nashua Bank debt?

LL:     Yes.

IR:     Were those lawsuits filed against you prior or your business interests prior to the divorce?

LL:     Yes.

IR:     Do you know why there's a recital or a discussion of these lawsuits in a modification agreement?

LL:     No.

IR:     And if you could now turn to the the next page page 3 of 6.  You there's there's now a second paragraph 6 talks about that lump sum distribution.

LL:     Mmm-hmm.

IR:     Do you agree with that?

LL:     Yes.

IR:     Okay any idea why it's now a 696 696,000 as opposed to 700,000?

LL:     No.

IR:     And you agree that you by that point had received $46,000.00?

LL:     Yes.

IR:     And you believe you got that as a check?

LL:     Yes.

IR:     Does a reference to 50,000 on or before October 1, 2010?

LL:     Yes.

IR:     Do you recall ever any discussion with anyone about getting $50,000 from Nanette on or before October 1ˢᵗ?

LL:     No.

IR:     Do you know why October 1ˢᵗ, the significance of that date?

LL:     No.

IR:     Is there a significance to the amount of 50,000?

LL:     I don't recall.  I don't know.

IR:     And then it says 600,000 to be paid upon the last to occur of the following.  Sale of the real estate, 423 Conehill Road, full and final release of all claims _____

LL:     _____ 50,000 was not paid.  46,000 was paid.  The 50 was not paid and the reason was is that the there could have been interest accrued with with Gordon debt

IR:     Mmm-hmm.

LL:     _____ the property hadn't been sold at the time.

IR:     Okay.

LL:     So I've I've never received anything but the 46

IR:     But

ALB:    But the Gordon debt as we've established was prior to

LL:     _____

ALB:    _____ prior to the divorce is what you think.

LL:     Well I'm going to change my testimony because it was it was paid the money was going to come from the proceeds of the sale of the Conehill property and _____ I don't remember the exact dates.

ALB:    But you would have listed that that that means you did list it on the financial statement

LL:     _____

ALB:    And she would have known I would assume she reviewed your financial statement

LL:     Yeah.  You know I just I don't remember the exact chronology I mean the fact is there is a debt and and

ALB:    But I believe your earlier testimony was it was right before there was the the transfer and it was around the transfer you asked for the loan and that was before that was around June or July and then August came _____ divorce

??:     _____

ALB:    Ask for the money after the divorce what you're

LL:     Well I mean I was never going to you know have _____ the money anyway.  The understanding was that that 700,000 would be used to pay off those debts

??:     _____

ALB:    Not that's in the modification in the modification.  The separation agreement that you're supposed to get 700,000.  _____ separation agreement it says 700,000.  She was obligated to Nashua Bank.  That was one of her obligations.

LL:     Right.

ALB:    Alright and and she listed that there.  So _____ 46,000 leaving _____ to be _____ paid at judgment 250,000 upon the sale of the Berkshire home.  Right here.

LL:     _____

ALB:    Here here's the lump sum distribution.  In order to accomplish an equity distribution of the marital assets.  That's what it says on paragraph 8 on page 32.

LL:     Mmm-hmm.

ALB:    Nanette shall transfer the sum of $700,000.00 in marketable securities as a division of asset and not as alimony payable in the following manner 196,000 within 14 days of the judgment.  She didn't.

LL:     Right.

ALB:    Okay. She paid you 46 leaving 196.  250 from the sale of the Berkshire home.  She didn't.  250 upon the full and final release from _____ liability on the obligation to Nashua.  She didn't.  In the event Nanette is called upon to pay did you ask her to pay the money?

LL:     I did not ask her to pay the money.

ALB:    Okay.  _____ Nashua Bank such amount to be deducted due Buddy hereunder but its a claim of Nanette's as well.  So in the event _____ advanced funds to Buddy thereunder is called upon to pay the debts of Buddy's that are greater than the remaining amount Buddy shall reimburse Nanette from the amount she pays in excess of that amount.  Did have you reimbursed her for anything?

LL:     No.

ALB:   Did you get anything other than 46 to reimburse her with?

LL:   No.

ALB:   Thank you.  So under this under this _____ here she has only paid you 46,000.

LL:   Correct.

ALB:   And she is obligated under this agreement to pay you 700,000.

LL:   Right.

ALB:   And none of these have been accomplished.  She hasn't paid you any of the the 250, the 250 or the 196.

LL:   No.

ALB:   Thank you.

IR:   And do you I'm not trying to harp on this but do you recall specifically when you were hospitalized like what month?

LL:   I don't remember.

IR:   Okay.  Did did do you feel that you were when you had your nervous breakdown I think you called it or a breakdown did you feel at that time that you were in a in any position to sign legal documents?

LL:   My judgment was not great.

IR:   Okay.

ALB:   Did she

IR:   Did she know you were hospitalized?

LL:   Yes.

IR:   And did she know that your judgment was not great?

LL:   Yes.

IR:   Not I don't mean to jump around but we were going through Nocona and if you to put a value on the asset at the time of the divorce what would you say that asset was worth?  Assuming you still holding an interest.  I'm not trying to take a position on that but around the time of the divorce if you had an interest in Nocona do you know what it _____?

LL:   What my interest was?

75

LL:    _____ there's one claim for wages.    _____

IR:    Okay.

WM:    There were some stockholders.

??:    Yeah.

IR:    Okay.

ALB:    Question.  During the time of the separation agreement did you try to consult with any
lawyer, did you have any thoughts of retaining counsel?

LL:    No.

ALB:    If you did would have money to pay counsel?

LL:    No.

ALB:    Did that enter into your mindset

LL:    No.

ALB:    In terms of that you would not have any money

LL:    No.

ALB:    To pay counsel with

LL:    No.

ALB:    Just decided

IR:    There's another document that I'd like to use

ALB:    _____ any reason for that _____?

LL:    You had to be there.  I mean I felt very guilty about a number of things mostly about the
loss of the money and I just didn't use very good judgment.  It was ridiculous looking
back.

ALB:    And you knew you would have creditors that would be coming after you

LL:    Yes.

ALB:    That weren't getting paid

LL:    Yup.

LL:      _____

IR:      Do you know who some of the other big clients are for Nanette?

LL:      No there was a it's constant change of people.  I I didn't get too involved in her business
         so.

IR:      But she was always doing _____?

LL:      Yeah she was sure.

IR:      Was her income always roughly the same from year to year?

LL:      Yeah.

IR:      She never had a like a really bad year?

LL:      I don't think so.  It was pretty consistent.

IR:      Did you ever participate at all in her business?

LL:      In what way?

IR:      In any way.  Did you ever give her feedback?  Talk to her about business ideas?

LL:      _____ at the end of the year because we did joint taxes I suppose I got involved at
         that time.  Other than that

IR:      Okay you were involved like in the _____ business

LL:      I no.

IR:      And you were involved in picking out fabrics and things like

LL:      Absolutely not.

IR:      Was she involved in any way in the running of your businesses?

LL:      My original business Asahe America she she was a director then we became a public
         company.

IR:      She was a director when you became public?

LL:      Yeah.

IR:      And I think we may not have covered this so let me let's just get this on record.  At some
         point Asahe was was a public company and you owned stock in it?

LL:      Yes

IR:     Is that correct?

LL:     Mmm-hmm.

IR:     Okay and you're a director of the company?

LL:     _____ chairman and CEO

IR:     Chairman and CEO.  Who founded that company?

LL:     I did.

IR:     You founded it.

LL:     I co-founded it with my father _____.  Off-shoot of another company.

IR:     And Asahe what was its main business?

LL:     We manufacture of plastic flow products, valves and controls and so forth

IR:     Okay.

LL:     Yeah.

IR:     Was before it went public was it private?

LL:     Yes.

IR:     Okay and who were the owners when it was private the first time?

LL:     I was the original owner _____ we we started this concept my dad and I and then I
        bought his shares of the company and then _____ I _____ in a Japanese
        manufacturers _____ our products became 50 50 partners and sellers in a Japanese trade
        company.

IR:     Is that why your company's called Asahe?

LL:     Yes.

IR:     Well did it have another name before that?

LL:     No.

IR:     Okay.

LL:     Well I shouldn't say that.  It started we started off as Asahe Sales of Massachusetts,
        Asahe _____ ultimately became Asahe America.

IR:     Okay but is the the

LL:     Asahe was always there.

IR:     Okay and when you you say you eventually went public.  How did _____ was it _____ was it _____?

LL:     NASDAQ

IR:     NASDAQ and at some point the company was bought by somebody else

LL:     It I _____ had Japanese partners and they didn't like the public so they purchased all the stock after about a year and half of being public and I stayed on as the CEO and for a couple of years a year and a half or two years I guess and then it was time time to part company and that went into the to _____ venture capital.

IR:     Okay so let's work backwards.  What do you mean it was time to go?

LL:     Well I had I had two contracts and you know you know each one was for a year and it was really a transition for them to you know transitions for them really taking over the company and I was kind of babysitting for a couple of years.

IR:     So was it more your idea to go or their idea

LL:     I think it was both of us.  I I you know yeah it was both.  It was mutually.

IR:     And when they bought the your stock what was what was the amount of your distribution?

??:     _____

LL:     5 5 million.

IR:     5 million.  Did you share that money any of that 5 million with Nanette?

LL:     Everything we had everything I had was joint.

IR:     Okay.  Well so I mean did you use any of that 5 million to buy real estate?

LL:     Yeah.

IR:     Okay.

LL:     We we bought we bought the home at 120 Cabot Street.

IR:     Was that a house or a condo?

LL:     House.

IR:     Okay.  Was that part of a a complex?

ALB:   Never.  So this statement here is an incorrect statement.

LL:   Correct.

??:   _____

ALB:   Okay page 8 material breach 8 okay page 8 11 breach of agreement.  Now we showed you before the modification agreement

LL:   Correct.

ALB:   But you said you don't remember

LL:   Right.

ALB:   You don't remember signing anything like that.  Okay so but to to your knowledge were you ever approached at all with regard to that modification?

LL:   No.

ALB:   Okay.  I just want to read for this the last sentence of paragraph 11 material breach shall include but not be limited to attempt to modify the provisions of that agreement that expressly survive the judgment of divorce.  Okay page 10 modification page 10 it states this agreement shall not be altered, modified or except by altered or modified except by an instrument signed and acknowledged by Nanette and Buddy before a notary public and you're saying you don't ever recall doing that.

LL:   Right.

ALB:   Any modifications must be approved by the probate and family court.  Have you ever authorized the modification to be filed with the probate court?  Okay and incorporated it into a judgment order thereof.  Did they ever tell you when you were did you ever ask for money that was _____ separation agreement or the divorce agreement?

LL:   The balance?

ALB:   Yeah.

LL:   Yes.

ALB:   And what were you told?

LL:   Told that you know I was told part I was told until until the there was going to be an interest charge on the Peter Gordon note.  It never really happened except that was held _____ for that and then it was _____ paying all these legal bills.

ALB:   But if Peter Gordon's note was paid prior to the filing there wouldn't have been interest _____

LL:     No There there was no interest but that was a caveat if there was interest if there was any interest.

ALB:    _____ they said they held the whole balance because of that

LL:     Yeah.  That and the fact that there was going to be litigation with this.

ALB:    Because there was going to be litigation with this so as you're asking for this money who was the one telling you now?

LL:     Nanette.

ALB:    Nanette is telling you I'm not going to pay you.

LL:     Right.

ALB:    Okay but you had to ask you asked for the money.

LL:     Mmm.

ALB:    Okay.  Did when after you asked for the money is that when you well because you never received or knew or heard about the modification therefore it never got into your hands to your knowledge.  So you were never told we're going to modify this so I don't have to pay you anything.

LL:     No.

ALB:    Okay.  Were you were you aware that in Massachusetts _____ any short of divorce of 23 with regard to a 23 year marriage that a permanent waiver of alimony is almost unheard of when you have spouses that are or at least one spouse in a marriage that is earning a income of significance and have have you ever heard of that or

LL:     Yes.

ALB:    You heard?

LL:     Yeah

ALB:    But you still waived it permanently

LL:     Yeah.

ALB:    And and why?

LL:     As I said at the beginning my judgment wasn't great.  It was it was guilt

ALB:    Did you also undergo

LL:     And stupidity.

ALB: _____ at that time but also you didn't think that that that you thought that the 700,000 was at least coming to you

LL: Yeah I did.

ALB: Okay. 14 paragraph 4 okay. I'll read it to but you can look at it here. Buddy and Nanette acknowledge that the financial provisions set forth in this Exhibit A are fair and reasonable. Did you believe that the provisions at that time leaving you as testified insolvent to be fair and reasonable?

LL: No.

??: _____

ALB: Adequate to meet their needs and commensurate with the parties' previous standard of living. Do you believe that statement to be accurate?

LL: No.

ALB: How were you provided the separation agreement? Let me clarify that

LL: I think I received it by mail.

ALB: _____

LL: Yeah

ALB: and at that time what did you do? Were you told to sign it?

LL: Yes

ALB: By whom?

LL: Well her her attorney _____.

ALB: So her attorney Nanette's attorney

LL: _____

ALB: _____ identify her by name if you would call

LL: Nancy Freed

ALB: Okay Nancy Freed told she called you?

LL: Yeah but I don't remember the details but _____ documents _____ done just come and sign them or sign them. I don't remember the details.

ALB: Okay. So she called you to tell you to sign these documents

LL:     Yeah.

ALB:   At any time when she was asking you to sign these documents did she say you should get an attorney to look them over?

LL:     No.

ALB:   Just just sign them

LL:     Yeah

ALB:   Who told you to initial the pages?

LL:     She did.

ALB:   She did okay.  Did she make a statement at any time during the time she did talk to you that she _____ Nanette's attorney.  I'm Nanette's attorney and Nanette's attorney only.  I do not work for you.

LL:     She she may have said that.

ALB:   May have said that.

LL:     May have said that

ALB:   Okay but at no time

LL:     _____ you each get your own attorney

ALB:   Attorney okay.  So you disagree with this statement that Buddy and Nanette acknowledge that the financial provisions set forth are fair and reasonable, adequate to meet their needs and commensurate with the parties' previous standard of living.

LL:     _____.

ALB:   Do you think Nanette Nanette knew that?

LL:     _____

ALB:   But this was enough to leave you with enough so that you would have be able to meet your standard of current standard of living?

LL:     She knew it.

ALB:   She knew what?  That you didn't have enough?

LL:     _____ I think she yeah I don't think that she I think she did know that as a result of all this that I wouldn't have

ALB:   That you wouldn't have enough

LL:   _____ yeah

ALB:   to meet your standard of living

LL:   Right

ALB:   Or that it would be fair and reasonable

LL:   Right.

ALB:   Okay.  Who selected Stanford Bernstein by the way?

LL:   We both did.

ALB:   You both you both did okay.  Now it mentions on page 19 about collections, art collections, royalties, pensions, stock options alright did you have all of those?  Did you have collections like art collections, antique collections?

LL:   Yes.

ALB:   At the time

LL:   Yes

ALB:   Right before the divorce.  Were there any royalties?

LL:   No.

ALB:   Okay pensions okay or stock options.  It does by way of example so I just wanted to make sure that was _____ page 21 _____ here.  On paragraph B(1) and _____ acknowledge and agree they hold real property _____.  Do you know what that number is?

LL:   50

ALB:   50 and are those your initials?  _____ asked you before but I don't I don't want to make sure we have the right documents

LL:   Yes.

ALB:   Okay and that's you think the proximate acreage remaining?

LL:   Yes.

ALB:   Okay.  Now who negotiated the use and occupancy agreement on on page 22.  You were given the opportunity to use and occupy provided the following that it was clean, that the grounds were kept and maintained, that you complied with the laws, additions and

ALB: _____ she disclosed that and she still has that business yet she was making all that money yet on the financial statement as you've seen you've seen she puts no value for the business. Correct?

LL: Right.

ALB: Question mark _____ and she says that she owes her business 500,000. I mean which which you can't figure how she would have loaned 500,000 or what she would do with 500,000. Do you recollect her putting 500,000 into her business?

LL: No but I mean I would I wouldn't know that.

ALB: Well it would have been from joint I mean I presume.

LL: I I the answer is no.

ALB: You wouldn't have known. Okay and you didn't you and until today you were you didn't know that.

LL: No I've seen her financial statement _____ insurance _____.

ALB: Oh okay.

LL: You know that I mean I haven't seen it up until the time that you saw that document.

ALB: The _____

LL: Yeah.

ALB: _____

LL: Yeah. A few months ago.

ALB: A few months ago

LL: Yeah

ALB: Okay.

LL: When whenever you get it.

ALB: Alright here's what we're going to do and I'll we're going to

IR: Can I ask a couple questions first?

ALB: Oh sure absolutely.

IR: Just just

IR:    Would you share with us what the nature of the guilt was?

LL:    Well it mostly it was because of money I felt you know guilty that I had I had some bad deals.  I wasn't particularly candid with her _____ we _____.  You know as these things were going along so there's a number of issues like those.

IR:    And so at the time she was presenting you with the divorce documents do you what would you say your mental state was in in contrast to the times in your life when you've been actively involved with business deals?

LL:    My judgment was not good.

IR:    And you undertook no attempts whatsoever to have _____ and you did you did you in fact read these documents carefully before signing them?

LL:    Yes.

IR:    Okay and did you understand at the time that essentially you would be left with effectively Boston Baseball and that was about it?

LL:    Yes.

IR:    Is it true that when you came to Pittsfield with Boston Baseball you were nevertheless optimistic that you would succeed?

LL:    Very optimistic

IR:    What was the basis of that?

LL:    That's a good question.  The basis of it was this you know area had supported professional baseball in the past.  They mayor at time was very enthusiastic and we just thought we had a different _____ to make it work.

IR:    And did you believe that Boston Baseball would be able to satisfy the remaining debt to for the team

LL:    Yes.

IR:    In Nashua?

LL:    Yes

IR:    Okay and when did you come to the realization that that would not in fact be possible?

LL:    Into the last year of the operations.

IR:    Okay.

ALB:   Which was when?

LL:     2011

??:     Okay

IR:     And and after the team ceased operating were you employed right away?

LL:     No.

IR:     How long were you unemployed?

LL:     Probably 6 months.

IR:     Okay and what what was your employment once you _____?

LL:     As the as selling timeshare.

IR:     Okay and

LL:     _____

IR:     What's what has been your average annual salary since you started to sell timeshare?

LL:     About 50,000

IR:     Okay and contrast that to your your ability to earn income either through stock transactions or otherwise in the years that you were married.  How much were you making when you were married?

LL:     Let's say in excess of 300,000

IR:     _____.

ALB:    _____ regard to that in your in your financials at the time of looking at the Greylock you were earning 9,000 a month whereas your financials in the probate say you were earning 2900 a month so you had to have an idea that the baseball was crumbling before your eyes.

LL:     I wasn't I was taking I wasn't taking any salaries in the baseball _____

ALB:    No it said you were earning 29 _____

LL:     _____ 22,000 _____ 24,000 30 whatever it is is social security.

ALB:    No I'm not taking about the bankruptcy schedules.

LL:     Oh.

LL:      Soon soon after this.

ALB:    Okay within

LL:      2 or 3 weeks.

ALB:    2 or 3 weeks okay so sometime in June so June of 09 and your hearing on the divorce
         was August 6th of 2010

LL:      Yes

ALB:    Meaning that I assume there were several weeks maybe even months to prepare the
         divorce documents so let's say it's approximately a year between the two.

LL:      Yes.

ALB:    Did yours and Nanette's joint net worth materially change between this day and the
         divorce?

LL:      Yes.

ALB:    Okay.  How did it material change.

LL:      It materially changed with the calling of the note from Boston Private Bank.

ALB:    Mmm-hmm.

LL:      And that's

ALB:    Calling of what note?

LL:      The 2 million dollar I had 2 million dollars

ALB:    Right.

LL:      in the account as collateral for a a loan

ALB:    Okay

LL:      That loan was called

ALB:    Okay

LL:      So

ALB:    And so they took that money

LL:      Right.

ALB:   Okay.  So now now you've got so that was 2 million from that account.  Was there any additional amounts that you owed Boston Private Bank as a result?

LL:   No.

ALB:   So the liabilities then based on this would have been 5.178

LL:   _____

ALB:   Okay.  Right because Boston Private Bank let's see what you listed Boston Private Bank here.  Let's just see for a moment.

IR:   It's on the second page.

ALB:   Alright.  So on the second page?

IR:   _____ liability?

ALB:   The asset

IR:   The assets on the second page to the left

ALB:   Boston Private 2 million so that would have changed

LL:   Yeah.

ALB:   But let's look at this carefully here.  So the assets that comprise of the 8.45 net worth or asset value

LL:   Mmm-hmm.

ALB:   Boston Private Bank, Sanford Bernstein and the real estate.

LL:   Right.

ALB:   Alright.  But is there anything in here about your wife's company?

LL:   No.

ALB:   Or any of the other assets that are mentioned?

LL:   No.

ALB:   So at a minimum, at a minimum your net worth as of the divorce should have been 5.178

LL:   Yes.

ALB:   And what was done with the 6 with the loan from Boston from from Greylock?  Your proceeds of that loan were used to

LL:     _____ to build the

ALB:    To build the house

LL:     Yeah

ALB:    Okay and therefore the value of that property _____ separate property here.  It
        doesn't break it up okay.  And so the value of that property with the 6.25 that wouldn't
        have decreased the value of the property would it?

LL:     At the time no.

ALB:    At the time.

LL:     Right.

ALB:    Okay so the 625 was put into the property to build the house so therefore at that time it
        wouldn't have affected the net equity.

LL:     No.

ALB:    So therefore it's reasonable to say based on these statements here which were signed by
        you and your wife submitted _____ within a year even taking into account the Boston
        Private Bank taking that would have been 5.1 million

LL:     Yeah.

ALB:    And from the divorce agreement you were supposed to 5.1 without the wife's business
        would generate your income of 30,000 a month of 300,000 plus a year from your
        testimony and from the wife's own financial statement

LL:     _____.

ALB:    Where she talks about her income of 300 some odd thousand dollars and 30,000 a month.
        So therefore is your testimony that your net worth at the time of the divorce was at least
        5.178 million?

LL:     Yes.

ALB:    And at that pursuant to the divorce you were only supposed to get 700,000

LL:     Yes.

ALB:    But you only got 43,000 of that 700,000

LL:     Right.

ALB:    I have no further questions.